# EXHIBIT 1

# EXHIBIT 1

**SERVICES AGREEMENT**
**Number HPK020**

Between

**LOCKHEED MARTIN CORPORATION**
**6801 ROCKLEDGE DRIVE**
**BETHESDA, MD 20817**

And

**BOTTOM LINE RECOVERIES, LLC**
**835 W Warner Rd Ste 101**
**Gilbert, AZ 85233-7268**

This Services Agreement entered into as of 07/01/2010 (the "Effective Date") is made by and between LOCKHEED MARTIN CORPORATION, acting by and through its Global Supply Chain Operations ("GSCO") within its Enterprise Operations organization (herein called "LMC" or "Lockheed Martin"), and BOTTOM LINE RECOVERIES, LLC (herein called "CONTRACTOR") for the purpose of entering into an agreement for services with Lockheed Martin Corporation.

NOW THEREFORE, the parties hereto, in consideration of the mutual promises recited herein, agree as follows,

1. **AGREEMENT**

   A. This Services Agreement consists of this agreement and the following documents in their entirety (collectively the "Agreement"):

      i. Exhibit A – Pricing Schedule (Revision 6-24-10)

      ii. Exhibit B -- Statement of Work (SOW) for Accounts Payable Audit & Recovery Services, dated 5/17/10 (Rev1)

   B. Any inconsistencies in this Agreement shall be resolved in accordance with the following descending order of precedence: (i) Face of the Purchase Order, Task Order, release document, or schedule (including any continuation sheets), as applicable, including any special terms and conditions; (ii) This Agreement; and (iii) Statement of Work.

2. **SERVICES BY CONTRACTOR**

   A. CONTRACTOR shall perform services in accordance with Exhibit "B", Statement of Work (SOW) ("Services").

07/02/2010 08:31 FAX 4807828540                                                                    ☑003

B. CONTRACTOR's primary contact with LOCKHEED MARTIN for operational issues shall be *Gary Philips*, herein called the "Agreement Monitor".

C. CONTRACTOR's primary contact with LOCKHEED MARTIN for contractual issues shall be *Sean Molloy*, herein called the "Lockheed Martin Procurement Representative or GSCO Project Manager".

3. **TERM**

A. The term of this Agreement shall commence on **July 1, 2010**. While it is anticipated that the Services will be completed by CONTRACTOR within a nine (9) month period of performance, in no event will this Agreement end any later than July, 21, 2011.

4. **PURCHASE ORDERS**

A. Performance by CONTRACTOR will be authorized upon the execution of this Agreement by the Lockheed Martin Procurement Representative.  In furtherance of CONTRACTOR's conduct of the Services, LOCKHEED MARTIN will submit on an ongoing basis representative entries from LOCKHEED MARTIN's database detailing amount of and purpose for purchase with its suppliers ("Lockheed Martin Spend Data") in accordance with Exhibit B, Statement of Work.

B. All contractual documents will indicate the LOCKHEED MARTIN Agreement Number.

5. **COMPENSATION FOR SERVICES**

A. CONTRACTOR shall be compensated for the Services performed hereunder in accordance with the Exhibit A, Pricing Schedule.  Such pricing shall remain firm during the term of this Agreement.

B. LOCKHEED MARTIN shall pay CONTRACTOR for Services performed hereunder within sixty (60) days following receipt and approval of a proper invoice. CONTRACTOR'S invoice shall be submitted electronically with the appropriate back up documentation which should reflect and document the LOCKHEED MARTIN Approval for the invoice submittal.

C. An proper invoice shall include, at a minimum:
   (1) Subcontractor's name and remittance address
   (2) Invoice number and date
   (3) Period applicable to the invoice.
   (4) Details for each corresponding LMC Business Unit(s)
   (5) Subcontract number.
   (6) Amount being invoiced and cumulative-to-date amounts.



07/02/2010 08:31 FAX 4807826540                                                          ☒004

6. **INDEPENDENT CONTRACTOR RELATIONSHIP**

   A. CONTRACTOR is an independent CONTRACTOR in all its operations and activities hereunder. The employees used by CONTRACTOR to perform Services under this Agreement shall be CONTRACTOR's employees exclusively without any relation whatsoever to LOCKHEED MARTIN.

   B. CONTRACTOR shall be responsible for all losses, costs, claims, causes of action, damages, liabilities, and expenses, including attorneys' fees, all expenses of litigation and/or settlement, and court costs, arising from any act or omission of CONTRACTOR, its officers, employees, agents, suppliers, or subcontractors at any tier, in the performance of any of its obligations under this Agreement.

7. **NON-DISCLOSURE OF PROPRIETARY OR CONFIDENTIAL INFORMATION**

   A. CONTRACTOR agrees not to disclose to others, either during or subsequent to the term of this Agreement, any LOCKHEED MARTIN information, knowledge, or data which CONTRACTOR may receive, or have access to, or which may otherwise be disclosed to CONTRACTOR, including proprietary or confidential information of LMC or of others having come into LMC'S or CONTRACTOR'S possession (hereinafter "LOCKHEED MARTIN INFORMATION"). LOCKHEED MARTIN INFORMATION comprises but is not limited to, business plans, marketing information, cost estimates, forecasts, bid and proposal data, financial data, formulae, compositions, products, processes, inventions, systems or designs.

   B. CONTRACTOR agrees that LOCKHEED MARTIN INFORMATION shall be used solely for the purpose of performing the Services required under this Agreement, and further agrees that except as may strictly be required by CONTRACTOR'S obligations under this Agreement, CONTRACTOR shall not reproduce, nor allow any third party to use or reproduce, any LOCKHEED MARTIN INFORMATION or any documents or other material containing LOCKHEED MARTIN INFORMATION. CONTRACTOR will use the same standard of care to protect LOCKHEED MARTIN INFORMATION that it uses to protect its own proprietary or confidential information, but under no circumstances less than a reasonable standard of care.

   C. CONTRACTOR shall promptly notify LOCKHEED MARTIN in the event of any actual or suspected breach of this provision where LOCKHEED MARTIN INFORMATION is or may be subject to unauthorized use or disclosure.

   D. All materials to which CONTRACTOR had access, or which were furnished or otherwise made available to CONTRACTOR in connection with the services performed hereunder, shall be and remain the property of LOCKHEED MARTIN INFORMATION. Upon expiration or termination of this Agreement, or upon request of LOCKHEED MARTIN, CONTRACTOR shall return to LOCKHEED MARTIN or destroy all such materials, documents and information, including any LOCKHEED MARTIN INFORMATION and all reproductions thereof, then in CONTRACTOR'S



07/02/2010 08:31 FAX 4807826540                                    ☑005

possession or control, and CONTRACTOR in connection with this Agreement in accordance with specific instructions issued by LOCKHEED MARTIN to CONTRACTOR and shall comply with any instructions within five (5) days of receipt thereof.

E.   CONTRACTOR'S obligations of confidentiality under this Agreement shall survive termination or expiration of this Agreement for five (5) years from such date.

## 8. INFORMATION OF CONTRACTOR

CONTRACTOR shall not provide any proprietary information to LOCKHEED MARTIN without prior execution of a proprietary information agreement by the Parties.

## 9. LIABILITY FOR SERVICES

LOCKHEED MARTIN shall not be liable to CONTRACTOR for any loss, injury, damage, expense or any liability whatsoever arising out of, or in connection with, the performance of the services required by this Agreement.

## 10. GOVERNING LAW

This Agreement shall be governed by, subject to, and construed according to the laws of the State of Maryland, excluding its choice of law rules.  CONTRACTOR shall comply with all applicable federal, state and local laws, orders and regulations, as well as with all LOCKHEED MARTIN policies, operating instructions, rules and regulations applicable to the performance of this Agreement.

## 11. TERMINATION

LOCKHEED MARTIN may terminate this Agreement without cause by thirty (30) days written notice to CONTRACTOR.  In the event of termination, with or without cause, LMC'S obligations shall be limited to fees earned and expenses incurred by CONTRACTOR to the effective date of termination.  Any reports in progress at the time of termination, for cause or otherwise, shall be submitted by CONTRACTOR to LOCKHEED MARTIN at no additional fee.

## 12. SEVERABILITY

If any provision of this Agreement shall be held illegal or unenforceable, the remainder of the Agreement or the application of any other provisions to the parties shall not be affected thereby.



13. **ACCEPTANCE OF CONTRACT/TERMS AND CONDITIONS**

A. This Agreement integrates, merges, and supersedes any prior offers, negotiations, and agreements concerning the subject matter hereof and constitutes the entire agreement between the Parties.

B. CONTRACTOR'S acknowledgment, acceptance of payment, or commencement of performance, shall constitute CONTRACTOR'S unqualified acceptance of this Agreement.

C. Additional or differing terms or conditions proposed by CONTRACTOR or included in CONTRACTOR'S acknowledgment hereof are hereby objected to by LOCKHEED MARTIN and have no effect unless accepted in writing by LOCKHEED MARTIN.

14. **ASSIGNMENT**

Any assignment of CONTRACTOR'S contract rights or delegation of duties shall be void, unless prior written consent is given by LOCKHEED MARTIN. However, CONTRACTOR may assign rights to be paid amounts due, or to become due, to a financing institution if LOCKHEED MARTIN is promptly furnished a signed copy of such assignment reasonably in advance of the due date for payment of any such amounts. Amounts assigned to an assignee shall be subject to setoffs or recoupment for any present or future claims of LOCKHEED MARTIN against CONTRACTOR. LOCKHEED MARTIN shall have the right to make settlements and/or adjustments in price with CONTRACTOR without notice to the assignee.

15. **DEFAULT**

A. LOCKHEED MARTIN, by written notice, may terminate this Contract for default, in whole or in part, if CONTRACTOR (i) fails to comply with any of the terms of this Agreement; (ii) fails to make progress so as to endanger performance of this Agreement; (iii) fails to provide adequate assurance of future performance; (iv) files or has filed against it a petition in bankruptcy; or (v) becomes insolvent or suffers a material adverse change in financial condition. CONTRACTOR shall have ten (10) days (or such longer period as LOCKHEED MARTIN may authorize in writing) to cure any such failure after receipt of notice from LOCKHEED MARTIN. Default involving delivery schedule delays, bankruptcy or adverse change in financial condition shall not be subject to the cure provision.

B. LOCKHEED MARTIN shall not be liable for any Services not accepted; however, LOCKHEED MARTIN may require CONTRACTOR to deliver to LOCKHEED MARTIN any supplies and materials, manufacturing materials, and manufacturing drawings that CONTRACTOR has specifically produced or acquired for the terminated portion of this Agreement. LOCKHEED MARTIN and CONTRACTOR shall agree on the amount of payment for these other deliverables.



C.  CONTRACTOR shall continue all Services not terminated.

16. **DISPUTES**

All disputes under this Agreement which are not disposed of by mutual agreement may be decided by recourse to an action at law or in equity.  Until final resolution of any dispute hereunder, CONTRACTOR shall diligently proceed with the performance of this Agreement as directed by LMC.

17. **GRATUITIES/KICKBACKS**

CONTRACTOR shall not offer or give a kickback or gratuity (in the form of entertainment, gifts, or otherwise) for the purpose of obtaining or rewarding favorable treatment as a LOCKHEED MARTIN supplier.

18. **INSURANCE/ENTRY ON LMC'S PROPERTY**

A.  In the event that CONTRACTOR, its employees, agents, or subcontractors enter the site(s) of LOCKHEED MARTIN or its customers for any reason in connection with this Agreement then CONTRACTOR and its subcontractors shall procure and maintain for the performance of this Agreement worker's compensation, comprehensive general liability, bodily injury and property damage insurance in reasonable amounts, and such other insurance as LOCKHEED MARTIN may require.  In addition, CONTRACTOR and its subcontractors shall comply with all site requirements.  CONTRACTOR shall provide LOCKHEED MARTIN thirty (30) days advance written notice prior to the effective date of any cancellation or change in the term or coverage of any of CONTRACTOR's required insurance, provided however such notice shall not relieve CONTRACTOR of its obligations to procure and maintain the required insurance.  If requested, CONTRACTOR shall send a "Certificate of Insurance" showing CONTRACTOR's compliance with these requirements. CONTRACTOR shall name LOCKHEED MARTIN as an additional insured for the duration of this Agreement. Insurance maintained pursuant to this clause shall be considered primary as respects the interest of LOCKHEED MARTIN and is not contributory with any insurance which LOCKHEED MARTIN may carry. "Subcontractor" as used in this clause shall include CONTRACTOR's subcontractors at any tier.   CONTRACTOR's obligations for procuring and maintaining insurance coverages are freestanding and are not affected by any other language in this Contract.

B.  CONTRACTOR'S personnel, including CONTRACTOR's subcontractors, shall comply with all LOCKHEED MARTIN security, safety, rules of conduct, badging and personal identity, and related requirements while on LOCKHEED MARTIN premises. In addition, prior to entry on LOCKHEED MARTIN premises, CONTRACTOR shall coordinate with LOCKHEED MARTIN to gain access to facilities. CONTRACTOR shall provide information reasonably required by LOCKHEED MARTIN to ensure proper identification of personnel, including but not limited to verification of citizenship, lawful permanent resident status, protected individual or other status. LOCKHEED MARTIN



may, at its sole discretion, have CONTRACTOR remove any specified employee of CONTRACTOR from LOCKHEED MARTIN's premises and request that such employee not be reassigned to any LOCKHEED MARTIN premises under this Agreement.

C. CONTRACTOR shall indemnify and hold harmless LOCKHEED MARTIN, its officers, employees, and agents from any losses, costs, claims, causes of action, damages, liabilities, and expenses, including attorneys' fees, all expenses of litigation and/or settlement, and court costs, by reason of property damage or loss or personal injury to any person caused in whole or in part by the actions or omissions of CONTRACTOR, its officers, employees, agents, suppliers, or subcontractors.

## 19. INTELLECTUAL PROPERTY

A. CONTRACTOR agrees that LOCKHEED MARTIN shall be the owner of all inventions, technology, designs, works of authorship, mask works, technical information, computer software, business information and other information conceived, developed or otherwise generated in the performance of this Agreement by or on behalf of CONTRACTOR. CONTRACTOR hereby assigns and agrees to assign all right title and interest in the foregoing to LOCKHEED MARTIN, including without limitation all copyrights, patent rights and other intellectual property rights therein and further agrees to execute, at LOCKHEED MARTIN's request and expense, all documentation necessary to perfect title therein in LOCKHEED MARTIN. CONTRACTOR agrees that it will maintain and disclose to LOCKHEED MARTIN written records of, and otherwise provide LOCKHEED MARTIN with full access to, the subject matter covered by this Agreement and that all such subject matter will be deemed information of LOCKHEED MARTIN and subject to the protection provisions of the clause entitled "Non-Disclosure of Proprietary or Confidential Information". CONTRACTOR agrees to assist LOCKHEED MARTIN, at LOCKHEED MARTIN's request and expense, in every reasonable way, in obtaining, maintaining, and enforcing patent and other intellectual property protection on the subject matter covered by this Clause.

B. CONTRACTOR warrants that the Services performed and delivered under this Agreement will not infringe or otherwise violate the intellectual property rights of any third party in the United States or any foreign country. CONTRACTOR agrees to defend, indemnify and hold harmless LOCKHEED MARTIN and its customers from and against any claims, damages, losses costs and expenses, including reasonable attorney's fees, arising out of any action by a third party that is based upon a claim that the Services performed or delivered under this Agreement infringes or otherwise violates the intellectual property rights of any person or entity.

C. To the extent that any pre-existing materials are contained in the deliverable items and not owned by LOCKHEED MARTIN pursuant to this or a previous agreement with CONTRACTOR, CONTRACTOR grants to LOCKHEED MARTIN an irrevocable, nonexclusive, world-wide, royalty-free license to: (i) use, execute, reproduce, display, perform, distribute (internally or externally) copies of, and prepare derivative works



based upon, such pre-existing materials and derivative works thereof, and (ii) authorize others to do any, some or all of the foregoing.

D. All reports, memoranda or other materials in written form, including machine readable form, prepared by CONTRACTOR pursuant to this Agreement and furnished to LOCKHEED MARTIN by CONTRACTOR hereunder shall become the sole property of LOCKHEED MARTIN.

## 20. <u>RELEASE OF INFORMATION</u>

Except as required by law, no public release of any information, or confirmation or denial of same, with respect to this Agreement or the subject matter hereof, will be made by CONTRACTOR without the prior written approval of LOCKHEED MARTIN.

## 21. <u>TIMELY PERFORMANCE</u>

A. CONTRACTOR'S timely performance is a critical element of this Agreement.

B. If CONTRACTOR becomes aware of difficulty in performing the Services, CONTRACTOR shall timely notify LOCKHEED MARTIN, in writing, giving pertinent details. This notification shall not change any delivery schedule.

## 22. *<u>RESERVED</u>*

## 23. <u>WAIVER, APPROVAL, AND REMEDIES</u>

A. Failure by either party to enforce any of the provisions of this Agreement or applicable law shall not constitute a waiver of the requirements of such provisions or law, or as a waiver of the right of a party thereafter to enforce such provision or law.

B. LOCKHEED MARTIN's approval of documents shall not relieve CONTRACTOR from complying with any requirements of this Agreement.

C. The rights and remedies of either party in this Agreement are cumulative and in addition to any other rights and remedies provided by law or in equity.

## 24. <u>EXAMINATION OF RECORDS</u>

A. CONTRACTOR shall maintain complete and accurate records in accordance with generally accepted accounting principles to substantiate CONTRACTOR's charges hereunder. Such records shall include, but not be limited to, applicable time sheets, job cards, phone bills, travel receipts and job summaries. CONTRACTOR shall retain such records for three (3) years from the end of this Agreement.

B. LOCKHEED MARTIN shall have access to such records, and any other records CONTRACTOR is required to maintain under this Agreement, for the purpose of audit



07/02/2010 08:32 FAX 4807826540                                                                    ☒010

during normal business hours, upon reasonable notice for so long as such records are required to be retained.

## 25. WARRANTY

A. CONTRACTOR warrants that it is and shall remain free of any obligation or restriction which would interfere or be inconsistent with or present a conflict of interest concerning the Services to be furnished by CONTRACTOR under this Agreement.

B. CONTRACTOR warrants that it will perform the Services under this Agreement with the degree of high professional skill and sound practices and judgment which is normally exercised by recognized professional firms with respect to Services of a similar nature.

C. CONTRACTOR warrants that all Services furnished pursuant to this Agreement shall strictly conform to applicable specifications, descriptions and other requirements of this Agreement and be free from defects in design, material and workmanship. This warranty shall begin upon final acceptance and extend for a period of one (1) year. If any non-conforming Services are identified within the warranty period, CONTRACTOR, at LOCKHEED MARTIN's option, shall promptly replace or reperform the Services. Transportation costs incurred by CONTRACTOR in relation to the reperformance of Services or delivery costs incurred by CONTRACTOR because of the return of non-conforming work shall be at CONTRACTOR's expense.   If replacement or reperformance of Services is not timely, LOCKHEED MARTIN may elect to reperform or reprocure the Services at CONTRACTOR's expense.  All warranties shall run to LOCKHEED MARTIN and its customers.

## 26. AMENDMENTS AND NOTICE

A. Sole authority to make changes in or amendments to this Agreement on behalf of LOCKHEED MARTIN rests with a LOCKHEED MARTIN GSCO Project Manager, and no direction from such administrator shall be valid unless in writing. All amendments must be identified as such in writing and executed by the parties.

B. Except as otherwise specifically provided herein, any notices to be furnished by CONTRACTOR to LOCKHEED MARTIN or by LOCKHEED MARTIN to CONTRACTOR shall be mailed, U.S. MAIL, Overnight Delivery or faxed to the following locations:

For **Agreement Monitor** Matters, to:

**Lockheed Martin Corporation**
**(LMC Division)**
**Gary Phillips,**
Attention:  Gary Phillips
Phone: 863/647-0429
Email: gary.phillips@lmco.com

07/02/2010 08:32 FAX 4807826540   ☒011

For **Contract** Matters, to:

**Lockheed Martin Corporation**
**Global Supply Chain Operations**
3 Executive Campus, 6SE
Cherry Hill, NJ 08002
Attention:  Sean Molloy
Phone: 856-792-9651
Fax:  856-792-9669
Email: sean.molloy@lmco.com

For **CONTRACTOR**, to:

**Bottom Line Recoveries**
**835 W Warner Rd Ste 101**
Gilbert, AZ 85233-7268
Attention:  Fred James, Partner
Phone: 480-782-8149
Email: fjames@bottomlinerecoveries.com

**IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first above written.**

**LOCKHEED MARTIN CORPORATION**                    **BOTTOM LINE RECOVERIES, LLC**

_____                    _____
Signature                                                  Signature

_Sean Molloy_                                        _Jay Brewer_
Printed Name                                          Printed Name

_Project Manager, Indirect Commodities_      _Managing Partner_
Title (GSCO PM)                                      Title

_7/6/10_                                                 _July 2nd, 2010_
Date                                                        Date

Services Agreement HPK020                                   10
Bottom Line Recoveries

## A/P Audit Recovery Services - Pricing Schedule
## Services Agreement HPK020

**Supplier Name:**     Bottom Line Recoveries, LLC

**DUNS Number:**     129095944

**Supplier POC:**     Fred James

(480) 782-8149

fjames@bottomlinerecoveries.com


**Lockheed Martin 2010 A/P Audit Recovery Services Pricing Proposal**



June 4, 2010

Lockheed Martin Company
Global Supply Chain Operations
3 Executive Campus, 6SE
Cherry Hill, NJ 08002

To Whom It May Concern:

In response to RFP INDSM051910 and based on our past experience with the Lockheed Martin
Corporation, Bottom Line Recoveries is pleased to offer the Lockheed Martin Corporation a flat
10% contingency rate for all claims recovered during the course of the Lockheed Martin
Corporation's 2010 accounts payable audit.  Payable terms are Net 60.

Respectfully,

Jay Brewer
Managing Partner
BLR, LLC



# Lockheed Martin Corporation

# Statement of Work

# for

# Accounts Payable Audit & Recovery Services

## 17 May 2010

## Revision: 1

---
**Global Supply Chain Operations – Project Manager**
**Sean Molloy**

---
**Accounts Payable Technical Representative**
**Gary Phillips**

LOCKHEED MARTIN

## Table of Contents

Accounts Payable Audit and Recovery Services

1 Introduction

    1.1 Purpose

    1.2 Scope

    1.3 Contractual Direction

    1.4 Project Direction

    1.5 Project Completion

    1.6 Period of Performance

    1.7 Place of Performance

2 Contract Management and Administration

    2.1 Contract Management

    2.2 Project Finance

    2.3 Quality

    2.4 Data

    2.5 Furnished Equipment

    2.6 Travel Requirements

3 Project Management and Administration

    3.1 Project Management

    3.2 Project Manager

    3.3 Accounts Payable Techncial Represenatative

    3.4 Project Schedule and Status Reveiws

        3.4.1 Project Schedule

        3.4.2 Project Status Reviews

    3.5 Refund Identification and Claims Processing

        3.5.1 Project Claim Processing

    3.6 Metrics Management

        3.6.1 Technical Performance Measurement

    3.7 Acceptance Criteria

    3.8 Deliverables

EXHIBIT A – DELIVERABLES

*LOCKHEED MARTIN*

# 1    INTRODUCTION

## 1.1 PURPOSE

This Statement of Work (SOW) defines the tasks and schedule required of Audit Services Company (hereafter referred to as "Seller") by LOCKHEED MARTIN CORPORATION, acting through its Enterprise Business Services organization, acting on behalf of its Business Units, (herein called "Lockheed Martin", "LMC" or "Buyer" ),   to provide Accounts Payable Audit and Recovery Service.

## 1.2 SCOPE

Open credits or debits reflected on the supplier statements older than 60 days from the date of the credit or debit, whether on or off of Lockheed Martin books, on which Lockheed Martin is not actively working, will be considered reimbursable findings and the Seller will prepare a claim for deduction.   It is agreed that 'actively working on the issue' means, in communication or attempting communication with the LMC supplier concerning that specific credit or debit within the past 60 days.

The Audit will consist of, among other activities and functions, the review of all paid invoices and related documents relating to LMC procurement processes and the identification and attempted recovery from LMC suppliers of payment errors, including without limitation, returns, overpayments and incorrect deductions.

The Seller will perform appropriate quality control reviews of its activities in connection with the Audits. Seller shall promptly notify the LMC Accounts Payable Technical Representative (APTR) of any significant internal control violations or system deficiencies identified by the company during the course of the Audits.

A Pre-Audit Planning meeting shall be scheduled to take place between LMC and the Seller prior to Audit commencement.

Seller shall provide all services, equipment, facilities and personnel required to perform all the functions associated with an accounts payable audit, which should include, but is not limited to, the review, analysis, identification and documentation of the Buyer data being provided in the accounts payable audit process as well as those efforts necessary to attempt recovery of funds resulting from the Audit. Seller shall provide all status documentation and performance measurement reporting of the audit results defined in the SOW.

The Audit will consist of the review of all paid invoices and related documents for LMC and for the period of 1/1/2007 through 12/31/2009 only. The Audit includes multiple accounts payable platforms utilized by the LMC Business Units (Apollo and multiple instances of SAP).

## 1.3 CONTRACTUAL DIRECTION

Reference the ~~Master Subcontract Agreement~~ *Services Agreement*

## 1.4 PROJECT DIRECTION

LOCKHEED MARTIN

The Seller is responsible for all cost and technical performance under this subcontract. The Seller performance to the requirements of this SOW shall be under the technical direction of the designated Buyer Accounts Payable Technical Representative (APTR) or designee.

## 1.5 PROJECT COMPLETION

The effort described by this SOW will be considered completed when either the period of performance has expired (see the Master Subcontract Agreement) or all items in the Subcontract Data Requirements List (SDRL) and all deliverables and effort specified herein as defined in this SOW have been delivered to the Buyer, accepted, verified, and approved by Buyer, whichever is first.

## 1.6 PERIOD OF PERFORMANCE

Reference the Master Subcontract Agreement.

## 1.7 PLACE OF PERFORMANCE

The Seller's tasks shall be primarily performed at the Seller's facility.
Any work performed at facilities other than the Sellers facility, such as at the Buyer's Facilities, must be mutually agreed upon by Buyer and Seller.

## 2   CONTRACT MANAGEMENT AND ADMINISTRATION

## 2.1 CONTRACT MANAGEMENT

The Seller shall perform contract management from the initiation of the Audit through contract performance, completion, and close-out. All cost associated with Contract management shall be the responsibility of the Seller.

## 2.2 PROJECT FINANCE

The Seller shall provide financial leadership and guidance throughout the life of the Project/Audit. The result of this activity is the timely and accurate reporting of Project/Audit cost along with timely and accurate cost accounting, bookkeeping, and billing. All cost associated with Project Finance shall be the responsibility of the Seller.

## 2.3 QUALITY

The Seller shall ensure that quality standards are achieved. This team effort spans the entire life cycle of the Project/Audit from award through Project Completion, ensuring the development of compliant products (e.g., reviews, identifications, documentation, and the adherence to required processes).
The Seller shall support site quality reviews and "as needed" audits by the Buyer. All cost associated with Quality shall be the responsibility of the Seller.

## 2.4 DATA

Subject to LMC discretion, LMC will provide the Seller with access to documents that the Seller believes to be reasonably necessary for the proper performance of the Audits, including but not limited to invoices, claims generated by other procurement process audits, payment adjustments and supplier statements, as well as electronic data files, and supporting documentation for all disbursements made during the relevant audit periods.  Such information shall also include, but not be limited to, any electronic data files that may be prepared by or on behalf of LMC in connection with any other procurement process auditing function performed by or on behalf of LMC.

*LMC Business Unit identifiers (ie, Electronics Systems-MS2 Manassas, Electronic Systems-MS2 Moorestown, Aeronautics-Ft. Worth, Space System-Sunnyvale, Space Systems-Denver, etc..) will be disclosed by LMC with all data provided to Seller.  Seller shall maintain the LMC Business Unit identifiers throughout all aspects of the Audit (including all deliverables, reporting, claim submission, etc...).*

## 2.5 FURNISHED EQUIPMENT

The Seller shall utilize its own equipment for the performance of this subcontract. There is no Buyer furnished equipment associated with this work, therefore Buyer is not required nor responsibility for any equipment associated with the performance of this subcontract.

## 2.6 TRAVEL REQUIREMENTS

In some instances Travel may be required for the performance of this subcontract. All cost associated with Travel shall be the responsibility of the Seller. Travel is not billable nor is it reimbursable under this subcontract.

## 3   PROJECT MANAGEMENT AND ADMINISTRATION

*Seller shall maintain the LMC Business Unit identifiers throughout all aspects of the Audit (including all deliverables, reporting, claim submission, etc...).*

## 3.1 PROJECT MANAGEMENT

The Seller shall provide effective management of all project activities to achieve desired cost, schedule, and technical performance and maintain customer satisfaction. The Seller Project Manager (SPM), supported by the Seller Project Management Team is responsible for executing this process. The project management system employed must be sufficient to provide the Buyer with in-depth, accurate, and timely information as to the technical, financial and schedule status of the subcontract. All cost associated with Seller Project Management shall be the responsibility of the Seller.

## 3.2 PROJECT MANAGER

For the period of performance of this subcontract, the Seller shall designate, by name, an individual as Seller Project Manager (SPM). The SPM shall be Buyer's main point of contact for all technical and project details. The SPM shall have responsibility and authority for overall compliance with the requirements of this SOW.  The SPM shall provide full visibility to Buyer on all aspects of performance covered by this SOW and immediately disclose existing or potential problems and planned resolutions. The SPM shall maintain a liaison with the Global Supply Chain Operations – Project Manager and Accounts Payable Technical Representative (APTR) to assure adherence to all requirements. The SPM shall not have any other responsibilities that could be broadly interpreted as conflicting with his/her objectivity or responsibility to Buyer.

## 3.3 ACCOUNTS PAYABLE TECHNCIAL REPRESENATATIVE

The SPM will coordinate with the Buyer's Accounts Payable Technical Representative (APTR) to acquire the initial and any subsequent Accounts Payable (AP) data on which the Audit(s) will be conducted. The LMC AP data will consist of PO and Invoice – then within a LMC specified time frame. The LMC data provide will include paid invoice detail transactions at a level of detail as coordinated with the seller. Data will be provided in an electronic format mutually acceptable by buyer and seller.

## 3.4 PROJECT SCHEDULE AND STATUS REVEIWS

LOCKHEED MARTIN

### 3.4.1 Project Schedule

The Seller shall establish a Project Schedule for the performance of this subcontract in accordance with the period of performance as defined in the Master Subcontract Agreement. The Seller shall develop the Project Schedule to a level of detail that provides insight regarding scheduled performance to the Buyer. The Seller shall update and report status weekly. Status should be reflected against this baseline plan. Actual start and completion dates or projected start and completion dates should be included for activities and milestones due or in progress. All costs to Seller associated with Project Schedule shall be the responsibility of the Seller.

The report shall be submitted in accordance with Project Schedule, *SDRL VM01*. This SDRL shall be provided in the Seller's standard format.

### 3.4.2 Project Status Reviews

#### 3.4.2.1 Weekly Communication

As a minimum, a standard form of weekly communication shall be established. This may consist of a teleconference, e-mail, visits, video conferences, or other means of communication. The content of the communication shall include, as a minimum, Project schedule, technical, and audit identification status, issues, risks, resolution plans, and action items. All cost to Seller associated with Weekly communications shall be the responsibility of the Seller.

#### 3.4.2.2 Monthly Status Reports

The Seller will provide a Monthly Status Report identifying the technical and schedule progress made by the Seller compared to the goals established in the Project. Each report shall clearly state the work accomplished on the project during the reporting period and shall be divided into the following sections:

1. Briefly describe work accomplished
2. Indicate if effort was successfully completed
3. Provide statements indicating if work progress is on schedule compared to planned milestone and an updated Schedule
4. A cumulative action item list depicting closed items, open items, with responsible Buyer and Seller personnel
5. Identify significant problems and proposed solutions, Risks and Risk Mitigation Plans.
6. Project management metrics, including technical performance, Product Assurance (internal & external audit results), etc.

The report shall be submitted in accordance with Monthly Status Report, *SDRL VM02*. All cost associated with Monthly Status Reports shall be the responsibility of the Seller.

#### 3.4.2.3 Quarterly Project Status Reports

The Seller shall submit formal Project Status Reports to Buyer which shall provide at a minimum:

1. Metrics of the Refunds Identified showing the number submitted for acceptance
2. Metrics of the Refunds Identified showing the number LMC Accepted and the number LMC did not accepted.
3. Metrics of the Refunds Identified showing by number the different types of refunds (the various justifications for the refund).
4. Report of recommendations for LMC process controls enhancements.
5. .Other supporting metrics and analysis as deemed relevant by seller.

However, please note that the object of the status reports is not quantity of charts and metrics, but rather quality, effectiveness and applicability of their conclusions.

The report shall be submitted in accordance with Quarterly Project Status Reports, *SDRL VM03*. All cost associated with Quarterly Project Status Reports shall be the responsibility of the Seller.

### 3.5 REFUND IDENTIFICATION AND CLAIMS PROCESSING

The Seller shall provide to Buyer each month a Refunds Identification List. This list shall contain the following information: (1) The PO Number Associated with the refund claim, (2) the Invoice Number and Invoice Date associated with the refund claim, (3) Rational for refund claim

The List shall be submitted in accordance with Refunds Identification List, *SDRL VM04*. All cost associated with Quarterly Project Status Reports shall be the responsibility of the Seller.

### 3.5.1 Project Claim Processing

1. Seller will submit to LMC APTR, for approval and processing by LMC, claims for reimbursement from LMC suppliers ("Claim(s)"), which Seller reasonably believes to be valid.   Such Claims will be based upon data provided to Seller by LMC.   All Claims will be processed for reimbursement (which reimbursement may be, but shall not be required to be, in the form of deduction from future invoices from such suppliers) within 30 days of the completion of LMC written Claim approval and processing procedures. LMC will not be liable for any claims processed which are not approved by our vendors for payment and received by LMC.

2. Seller will comply with LMC's established Claims processing procedures, including processing of charge backs, preparation of claim forms, and the extent of supporting documentation necessary for Claim processing.   LMC shall not provide copies of any documentation relating to any Claims identified by Seller to any other firm that provides comparable services to LMC on comparable procurement processes.

3. Seller will provide post-Audit assistance, as reasonably necessary, and will be responsible for supplier inquiries that may result from the Audit.

### 3.6 METRICS MANAGEMENT

The Seller shall implement and maintain a metrics management process. The purpose of this process is to establish a set of indicators (metrics) to be used by the project to address their information needs, including understanding the current state of the project, managing the project, identifying opportunities for project and/or organizational process improvement, and facilitating cost, schedule, and quality estimation. All cost associated with Metrics Management shall be the responsibility of the Seller.

### 3.6.1 Technical Performance Measurement (TPM)

The Seller shall track critical technical performance parameters, as defined below. Status of these parameters shall be reported on a Monthly basis in a mutually agreeable format, showing status against the contractual requirement and target values in the Monthly Status reports (VM02). The final analysis report at the conclusion of this effort shall show the cumulative totals for the requirements as well.

*Sample TPMs*

| TPM | Value | Dates | LMC Business Unit |
| --- | --- | --- | --- |
| Accounts Payables reviewed totals under S25K | # | Monthly, with cumulative amounts from previous months | |
| Accounts Payables reviewed totals over S25K and under 100K | # | Monthly, with cumulative amounts from previous months | |
| Accounts Payables reviewed totals over $100K and under | # | Monthly, with cumulative amounts from previous | |

LOCKHEED MARTIN

| | | | |
|---|---|---|---|
| 500K | | months | |
| Accounts Payables reviewed totals over $500K | # | Monthly, with cumulative amounts from previous months | |
| Accounts Payables reviewed with refunds due for PO's under $25K | # | Monthly, with cumulative amounts from previous months | |
| Accounts Payables reviewed with refunds due for PO's over $25K and under 100K | # | Monthly, with cumulative amounts from previous months | |
| Accounts Payables reviewed with refunds due for PO's over $100K and under 500K | # | Monthly, with cumulative amounts from previous months | |
| Accounts Payables reviewed with refunds due for PO's over $500K | # | Monthly, with cumulative amounts from previous months | |
| Refunds identified that are under $200 | # | Monthly, with cumulative amounts from previous months | |
| Refunds identified that are over $200 and under $1K | # | Monthly, with cumulative amounts from previous months | |
| Refunds identified that are over $1K and under $5K | # | Monthly, with cumulative amounts from previous months | |
| Refunds identified that are over $5K and under $10K | # | Monthly, with cumulative amounts from previous months | |
| Refunds identified that are over $10K | # | Monthly, with cumulative amounts from previous months | |

## 3.7    ACCEPTENCE CRITERIA

The acceptance criteria and process shall be as follows:

1. Each month the Seller shall submit the Refunds Identification List in accordance with paragraph 3.6 of this SOW.

2. Buyer shall review the Refunds Identification List submitted and provide a response to Seller within 30 days. The response shall be provided electronically (via email) and shall state which refund claims on the list Buyer approves or disapproves

3. The refund claims that have been disapproved shall have the Buyer's rationale for this disapproval. Seller shall discontinue any work associated with the disapproved refunds.

4. The refund claims that have been approved, the Seller shall continue working. This approval gives the Seller authorization to proceed with the Refund Recoveries activities and shall be authorized to act on behalf of Buyer for these approved refund claims' recovery activities only.

5. The Seller shall list all successful recoveries in their monthly status report and shall invoice in accordance with the Master subcontract agreement associated with this SOW.

6. Buyer approval of the invoices for the successful recoveries shall constitute acceptance for the services rendered by the Seller. No other interim acceptance documentation shall be required for this activity. Final acceptance shall be considered provided upon approval of the last invoice submitted under the Master Subcontract Agreement associated with this SOW.

LOCKHEED MARTIN

## 3.8 DELIVERABLES

All Deliverables (Data and Software) shall be submitted with a letter clearly stating the SDRL Item number, and SDRL Title or Software Revision Number and Software Title, and the Date of Delivery. Data Deliverables will be produced and distributed IAW Exhibit A of this document as required.

## EXHIBIT A – DELIVERABLES

### Subcontractor Data Requirements List (SDRL)

|  | TITLE | SOW Paragraph | DELIVERY | DELIVER TO | DUE DATE |
|---|---|---|---|---|---|
| VM01 | Project Schedule | 3.4.1 | OTO | SCA | 30 days ACA |
| VM02 | Monthly Status Report | 3.4.2.2 | MO | SMT | 5th of the Month |
| VM03 | Quarterly Project Status Reports | 3.4.2.3 | QTR | APTR | 5th of the Month |
| VM04 | Refund Identification List | 3.5 | MO | APTR | 5th of the Month |
| VM05 | Project Claim Processing Plan | 3.5.1 | OTO | SMT | 10 days ACA |

| ACA | - After Contract Award | SCA | - LMC Subcontract Administrator |
|---|---|---|---|
| WK | - Weekly | LPD | - LMC Project Manager or designee |
| MO | - Monthly | APTR | - LMC Accounts Payable Technical Representative |
| AR | - As Required | SMT | - LMC Subcontract management Team |
| OTO | - One Time Only |  | (consisting of the SCA, LPD & APTR) |

//////////////////////////////////////////// End of Document ////////////////////////////////////////////